# In the United States Court of Federal Claims

No. 09-814C

(Filed: May 7, 2012)

_____

| | |
|---|---|
| PEW FOREST PRODUCTS, | * |
| | * |
| Plaintiff, | *  Timber contract case; Cross-motion for |
| | *  summary judgment; Existence of contracts – |
| | *  offer and acceptance; Implied-in-fact |
| v. | *  contracts; Covenant of good faith and fair |
| | *  dealing; No breach; Defendant's motion for |
| THE UNITED STATES, | *  summary judgment granted. |
| | * |
| Defendant. | * |
| | * |

_____

**OPINION**

_____

*Robert J. Tuerck,* Jackson and Tuerck, Quincy, CA, for plaintiff.

*Ellen M. Lynch*, Commercial Litigation Branch, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

In this government contract case, Pew Forest Products (Pew) alleges that the United States Forest Service (the Forest Service) breached its timber sale contracts by delaying logging operations, and by failing to provide plaintiff with the contractual remedies for that delay to which it was entitled. The parties have filed cross-motions for summary judgment. Following oral argument, and after further review of the briefs and accompanying appendices, the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for partial summary judgment.

**I.     BACKGROUND**

A brief recitation of the underlying facts sets the context for this decision.

Pew is a family-owned logging company based in Crescent Mills, California. Pew has been involved in the purchase and harvest of timber from the Forest Service for the past thirty-five years.

In September 2006, the Forest Service approved the Freeman Project, a forest management plan that included the sale and harvest of certain timber located in the Plumas National Forest in California (Plumas).[1] On May 21, 2007, the Forest Service sent Pew and other logging companies prospectuses for two timber sales: the Jenkins Multi-Product Thin (Jenkins) and the Summit Bear Multi-Product Thin (Summit Bear). Both sales involved timber located on the Beckwourth Ranger District in Plumas. The letter accompanying these prospectuses indicated that bids for these projects would be opened on June 26, 2007. Both the letter and the prospectuses, however, warned potential bidders that a pike eradication project, planned by the California Department of Fish and Game for "areas immediately adjacent to Lake Davis and perennial stream courses flowing into Lake Davis" could disrupt access to the timber sale area for up to one month between July and October of 2007. These same documents warned that ongoing environmental litigation regarding the Freeman Project could lead to the suspension, modification or termination of any contract, adding that the contracts would provide "for limited remedies" in the case of such litigation-generated action.[2]

---

[1] The Forest Service is charged with the management of our national forests through the development and implementation of forest management plans. *See* The National Forest Management Act, 16 U.S.C. § 1600 *et seq.* Through the latter plans, the Forest Service organizes and administers timber sales. *See* 16 U.S.C. §§ 1611, 1613.

[2] Regarding the period of contract, each prospectus stated –

The normal operating season covers the period between 06/01 and 10/31. Contract termination date is 03/31/2010. Extensions of this contract may be granted only when the purchaser has met specified conditions.

If an appeal or lawsuit is filed challenging the decision to award this contract or upon determination by the Regional Forester that conditions existing on this timber sale are the same as, or nearly the same as, conditions existing on other timber sale(s) in appeal or litigation, Contracting Officer may delay award or reject all bids. If delay in award is for 30 days or more during Normal Operating Season after bid opening, Contracting Officer shall, upon award, adjust the contract term to include additional calendar days in one or more Normal Operating Seasons equal to the time award is delayed during Normal Operating Season.

On May 22, 2007, as part of ongoing litigation involving timber sales, environmental groups filed a motion for a preliminary injunction to prevent the Forest Service from "awarding logging contracts or otherwise carrying out the Freeman Project." The United States District Court for the Eastern District of California denied the environmentalists' motion on June 8, 2007. On June 26, 2007, Pew submitted bid forms for both timber sales. These bids were submitted on preprinted forms supplied by the Forest Service. These forms contained language that provided – "[s]igning this bid form binds the Bidder to accept award under the terms of the sample contract and this bid form if its bid is accepted within 90 days after bid opening." They also stated that "[t]he Bidder whose bid is accepted will, within 30 days of the award letter's date, or any written extension thereof by the Forest Service, execute a timber sale contract which shall be provided by the Forest Service and be based on the sample contract referenced in the prospectus." On June 26, 2007, Joseph Franco, the Forest Service contracting officer (CO) for the Jenkins and Summit Bear contracts, determined that the Freeman Project could proceed and opened the bids. As plaintiff was the only bidder for these contracts, it was declared the high bidder.

The Forest Service's regional office instructed the CO to delay awarding the contracts while negotiations with the environmental groups progressed. The CO passed this information along to Randy Pew, Pew's owner, and asked him to attend a meeting with representatives from the Forest Service and the environmental groups. Mr. Pew complied with this request. At that meeting, the environmental groups explained their concerns with the Jenkins and Summit Bear timber sales, but agreed to drop their opposition to those sales as long as the logging operations did not begin until after September 15, 2007.

On August 31, 2007, the Forest Service sent Pew a letter for each of the Jenkins and Summit Bear timber sales indicating that "[y]our bid has been accepted and you are hereby awarded the timber sale contract." Enclosed with each letter was a contract for the respective timber sale. That same day, the CO and Mr. Pew signed an agreement that delayed operations on the Jenkins and Summit Bear sales until after September 15, 2007. Shortly before the award of these contracts, the CO and Mr. Pew also signed a "Pre-Award Waiver, Release and Limitation of Liability Agreement" for each sales contract. These waivers both stated, in pertinent part, that plaintiff "desires the Forest Service to proceed with the award of the contract, despite the possibility that the Forest Service might delay or suspend operations, and/or modify or terminate the contract." Mr. Pew, who signed the waiver agreements on behalf of Pew, did not inform anyone at the Forest Service that he was unwilling to accept this limitation. He alleges that he felt that if he did not sign the waivers, Pew would be viewed by the Forest Service as having repudiated the contracts.

Plaintiff moved its logging equipment to the Jenkins timber sale area on September 17, 2007. The parties dispute when plaintiff actually commenced logging. Plaintiff suffered further delays when access to the logging site was disrupted by a pike eradication project run by the California Department of Fish and Game. That project was completed on October 1, 2007. On October 2, 2007, plaintiff removed the first load of timber from the Jenkins site.

On January 4, 2008, Pew requested a rate redetermination pursuant to paragraph B3.33 of its contracts to compensate it for what it claimed was a drop in the value of the contract. That paragraph provided that –

> In the event of delay or interruption, exceeding 90 days, under B8.33, Contracting Officer shall make an appraisal to determine for each species the difference between the appraised unit value of Included Timber immediately prior to the delay or interruption and the appraised unit value of Included Timber immediately after the delay or interruption.

The CO granted the request and the rate determination was performed. However, the Forest Service found that the value of the contract had increased and, therefore, denied plaintiff the adjustment it sought. Pew completed logging operations on the Jenkins sale on January 8, 2008. It never began logging operations on the Summit Bear sale because a decline in timber prices led it to believe that the area could no longer be logged profitably under the 2007 contract. On August 29, 2008, plaintiff submitted a certified claim to the CO, seeking damages for the losses sustained as a result of the delays. On May 21, 2009, the CO denied this claim.

Plaintiff filed its complaint in this court on November 20, 2009. Following discovery, on May 13, 2011, defendant filed a motion for summary judgment. On June 13, 2011, plaintiff filed a cross-motion for partial summary judgment. Briefing and argument of these cross-motions has been completed.

## II.   DISCUSSION

We begin with common ground. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id*. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id*.; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. Immigration & Naturalization Serv.*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *see also Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005). "Where, as here, a court rules on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Carolina Plating Works, Inc. v. United States*, 102 Fed. Cl. 555, 559 (2011).[3]

### A.   When did the contracts come into existence?

It is undisputed that the parties entered into two timber sales contracts. What is disputed is when those contracts came into existence. Plaintiff contends that the contracts came into being on June 26, 2007, when plaintiff was declared the high bidder. Not so, defendant asseverates, claiming that the contracts were not formed until August 31, 2007, the date on which the contracts were signed.

Both parties agree that for there to be a contract with the United States, there must be a mutual intent to contract including an offer, an acceptance, and consideration. *See Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). In addition, the government representative who entered into the agreement must have actual authority to bind the United States. *Chattler*, 632 F.3d at 1330. In concluding whether and when these formation requirements are met, the court must give effect to the plain meaning of the language employed by the parties in the various bidding and contracting documents. *See Stockton E. Water Dist. v. United State*s, 583 F.3d 1344, 1362 n.35 (Fed. Cir. 2009) ("Ordinarily when a provision is found to have a plain meaning, that is deemed to conclusively establish the parties' intent."); *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996) (same); *Dobyns v. United States*, 91 Fed.Cl. 412, 420 (2010).

In terms of the elements listed above, the focus on when the contracts arose here is on offer and acceptance. The parties essentially agree that Pew's bids constituted "offers" to remove timber from the two tracts. Plaintiff claims that these offers were accepted when the Forest Service CO opened the bids and determined that Pew was the winning bidder. But, defendant argues that Pew improperly conflates the fact that it was declared the apparent high bidder with the acceptance of its offers by the Forest Service.

---

[3] *See Chevron U.S.A. Inc. v. Mobil Producing Tex. & N. Mex.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010); *Stovall*, 94 Fed. Cl. at 344; *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed. Cl. 144, 148 (2010).

The record strongly supports defendant's view. For one thing, the bid form used by Pew indicates that the bidder would accept an award "if its bid is accepted within 90 days after bid opening." This language plainly suggests that the mere opening of a bid did not constitute the acceptance of an offer and that, instead, the award would follow later. This reading is confirmed by another statement in the bid form indicating that "[t]he Bidder whose bid is accepted will, within 30 days of the award letter's date . . . execute a timber sale contract which shall be provided by the Forest Service and be based on the sample contract referenced in the prospectus." Again, this sentence plainly distinguishes between the acceptance of a bid, on the one hand, and the award date and the execution of the contract, on the other. Consistent with this reading of the bids, the formal contracts for the timber sales were signed within the period prescribed in the bids, on August 31, 2007, on the same day the award letter was sent and 67 days after the bid opening. It is difficult to see how plaintiff could believe that the awards came sooner. For one thing, it was not until August 31, 2007, that it received letters from the Forest Service for each sale announcing that "[s]ealed bids for the [contract] were opened on 6/26/2007," and adding that "[y]our bid has been accepted and you are hereby awarded the timber sale contract." And it was on that same day – August 31, 2007 – that plaintiff signed a document entitled "Pre-Award Waiver, Release and Limitation of Liability Agreement" for each of the timber sales, one of the recitals of which indicated that "[w]hereas Purchaser desires the Forest Service to proceed with the award of the contract." Taken together, the letter and waiver agreement confirm what the bidding and contract documents themselves unambiguously reveal, *to wit*, that no contracts arose here until August 31, 2007.

Certainly, these documents do not manifest the "unambiguous acceptance" required to create a binding contractual obligation. *See Peninsula Grp. Capital Corp. v. United States*, 93 Fed. Cl. 720, 729-30 (2010); *see also Essen Mall Prop. v. United States*, 21 Cl. Ct. 430, 440 (1990); *Uniq Computer Corp. for Benefit of U.S. Leasing Corp. v. United States*, 20 Cl. Ct. 222, 231-32 (1990). *Per contra*. They unambiguously indicate that the opening of the bids and declaration that plaintiff's bids were highest was not tantamount to the acceptance of plaintiff's offers, which did not occur until the awards were made and the formal contracts signed. Plaintiff should not be heard to argue otherwise – particularly based on the claim that Mr. Pew, despite signing various contractual documents on August 31, 2007, secretly believed that the contracts somehow had already been formed. The law is decidedly hostile to such claims. *See Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971) ("The unexpressed, subjective unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise."); *see also Standard Oil Co. of Cal. v. United States*, 685 F.2d 1337, 1345 (Ct. Cl. 1982); *Public Serv. Co. of Okla. v. United States*, 88 Fed. Cl. 250, 262 (2009).[4] And this case warrants no departure.

---

[4] Plaintiff implies that because Mr. Pew subjectively believed that the contracts were already in place, while defendant did not, there was no meeting of the minds in the written contracts. This court rejected a similar claim in *Applegate v. United States*, 52 Fed. Cl. 751, 756 n.6 (2002), stating "[t]his sort of contention is far too convenient, for it effectively would allow one contracting party to renege on a contract at will based on unexpressed intentions." The court

Plaintiff's argument that the Forest Service accepted its offer by declaring plaintiff the high bidder also runs afoul of the relevant Forest Service regulations governing timber sales.[5] Those regulations contemplate that, in the case of sealed bidding, the award will be made to the "responsible bidder submitting the highest bid that conforms to the conditions of the sale as stated in the prospectus" – but with some important caveats that make clear that such an award is not automatic. *See* 36 C.F.R. § 223.100 (indicating, for example, that the agency may not award the contract if the highest bidder is "notoriously or habitually careless with fire" or the result would result in a "monopoly" over "large amounts of public and private timber"). Nor may an award be made under this regulation to the high bidder unless it is determined to be "responsible." *See* 3 George Cameron Coggins and Robert L. Glicksman, Pub. Nat. Resources L. § 34:30 (2d ed. 2012) ([a] contracting officer may not award a timber contract unless he or she makes an affirmative determination of purchaser responsibility"); *see also* 36 C.F.R. § 223.101(a). In this regard, section 223.101 of these regulations lists six separate conditions that must be satisfied before the contracting officer can determine that the highest bidder is "responsible." 36 C.F.R. § 223.101(b).[6] Other regulations require the agency to perform various tasks "[i]f the highest bid is not accepted," again indicating acceptance is not automatic. *See* 36 C.F.R. § 223.102. And still other provisions specify who within the agency has the authority "formally to execute timber sale contracts," 36 C.F.R. § 223.110 – a provision that would make little sense if, as plaintiff claims, the Forest Service intended a timber sales contract to arise upon the opening of the bids. Indeed, this last point is, in many ways, determinative, because it is well-accepted that a contract is not deemed to arise if at least one of the parties anticipates that the agreement will not occur until the agreement is reduced to writing and formally executed. *See Peninsula Grp. Capital Corp.*, 93 Fed. Cl. at 729; *see also* Restatement (Second) Contracts § 27 cmt. b-c.

---

added that "[s]uch is decidedly not the law, particularly where, as here, there is no ambiguity in the contract itself. *Id.* (citing Restatement (Second) of Contracts § 2 cmt. b (1981)).

[5] These regulations are relevant as courts have often held that a contract cannot arise until the statutes or regulations governing its formation are followed. *See Russell Corp. v. United States*, 537 F.2d 474, 477 (Ct. Cl. 1976); *Peninsula Grp. Capital Corp.*, 93 Fed. Cl. at 730; *Ruttenburg v. United States*, 65 Fed. Cl. 43, 48-49 (2005).

[6] This responsibility determination is anything but *pro forma*. In assessing responsibility, the contracting officer is required by the regulations to determine that the purchaser: (i) has adequate resources to perform the contract or the ability to obtain them; (ii) is able to perform the contract within the contract term taking into account all other business commitments; (iii) has a satisfactory performance record on timber sales; (iv) has a satisfactory record of integrity and business ethics; (v) has or is able to obtain equipment and supplies suitable for logging the timber and to provide resource protection; and (vi) is otherwise qualified and eligible to receive the award under applicable laws and regulations. 36 C.F.R. § 223.101(b); *see also Thomas Creek Lumber and Log Co. v. United States*, 22 Cl. Ct. 559, 561 (1991); *Northwest Ecosystem Alliance*, 96-2 C.P.D. ¶ 12 (1996); 3 Pub. Nat. Resources L, at § 34:30.

In the court's view, there are no questions of fact that prevent the court from determining when the contracts here arose. "[N]o acceptance mean[s] no contact." *Fletcher-Harlee Corp. v. Pote Concrete Contractor, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). Based on the foregoing, the court concludes, as a matter of law, that the timber contracts between the parties arose no earlier than August 31, 2007.

### B.     Did the parties have other agreements?

Plaintiff asserts that, besides the timber contracts, it had two other agreements with defendant that it claims were breached.

First, it contends that an implied in-fact contract governing the timber sales sprung into existence on June 26, 2007, the date its bids were opened and deemed highest. But, there are several problems with this assertion. For one thing, the requirements for an implied-in-fact contract are the same as those for an express contract. *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Accordingly, if, as demonstrated above, the requirements for the formation of an express contract were not met here until August 31, 2007, the same is true for any implied-in-fact contract. In addition, "[i]t is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with same subject matter." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002); *see also Trauma Serv. Grp.*, 104 F.3d at 1326; *Atlas Corp. v. United States*, 895 F.2d 745, 754-55 (Fed. Cir. 1990). This rule applies equally to an implied-in-fact contract that is claimed to have arisen before an anticipated express contract, simultaneously with the execution of the express contract, or after the express contract has been formed. *See Bank of Guam v. United States*, 578 F.3d 1318, 1329 (Fed. Cir. 2009); *Schism*, 316 F.3d at 1278 (after); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008); *Atlas*, 895 F.2d at 755; *ITT Fed. Support Servs., Inc. v. United States*, 531 F.2d 522, 528 (Ct. Cl. 1976); *Jumah v. United States*, 90 Fed. Cl. 603, 610 (2009) (simultaneous); *Ruttenburg*, 65 Fed. Cl. at 49 (before). Accordingly, as a matter of law, the court rejects the assertion that an implied-in-fact contract ever existed here.

Beyond this, defendant does not contest that two implied duties of good faith and fair dealing arose here. The first of these required the Forest Service to "afford [the bidder's] submission fair and honest consideration." *Thomas Creek Lumber*, 22 Cl. Ct. at 566 (citing *United States v. Grimberg Co.*, 702 F.2d 1362, 1373 (Fed. Cir. 1983)). But, there is no contention that this duty was breached here.

The second implied duty of good faith and fair dealing was an implied term in the timber contracts that were executed on August 31, 2007. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *Link v. Dept. of the Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995). Thus, "[e]very contract . . . imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting *Luria Bros. v. United States*, 369

F.2d 701, 708 (Ct. Cl. 1966)); *see also North Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 187 (2007); *H & S Mfg., Inc. v. United States*, 66 Fed. Cl. 301, 310 (2005), *aff'd*, 192 Fed. Appx. 965 (Fed. Cir. 2006). Such covenants require each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304; *see also North Star Alaska Hous. Corp.*, 76 Fed. Cl. at 187. This "duty not to hinder is breached when the Government commits 'actions that unreasonably cause delay or hindrance to contract performance.'" *H & S Mfg.*, 66 Fed. Cl. at 311 (quoting *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993)). Such a breach occurs when, in the words of Judge Posner, there has been "sharp dealing," defined as taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract." *Mkt. St. Assocs. Ltd. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991); *see also North Star Alaska Hous. Corp.*, 76 Fed. Cl. at 187.

Finally on this count, there is no evidence to support plaintiff's claim that yet another covenant of good faith and fair dealing arose after plaintiff was declared the high bidder and ran until the timber contracts were signed on August 31, 2007. Plaintiff does not identify the legal basis for this covenant. And, upon further examination, it appears that the duty that plaintiff claims sprung into existence – which required the Forest Service to allow plaintiff access to the timber in question on an earlier date – is really nothing more than a reprise of plaintiff's implied-in-fact contract claims in "covenant clothing." In the court's view, if no implied-in-fact contract arose requiring the Forest Service to provide plaintiff with earlier access to the timber, then the same conclusion must obtain vis-à-vis plaintiff's covenant claim. Of course, it should not be overlooked that even if such a covenant existed, plaintiff has provided absolutely no evidence that the "delay" which occurred between the opening of its bids and the signing of the formal contracts was attributable to a lack of good faith and fair dealing, *i.e.*, to "some specific intent to injure the plaintiff." *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). Hence, this claim must also fail.

### C.  Did defendant breach the timber sales contracts?

The court is left to decide whether defendant breached the timber contracts (and the associated covenant of good faith and fair dealing) by delaying or hindering Pew's logging activities.

Of course, most of plaintiff's breach arguments are predicated upon the misapprehension that the timber sales contracts were formed at the time of the bid opening – and to that extent must be rejected. But, plaintiff also claims that the Forest Service breached the timber contracts by delaying logging operations: (i) from August 31, 2007, through September 15, 2007, to deal with the concerns raised by environmental groups; and (ii) for some additional period owing to the State of California's pike eradication program. Both of these claims, however, are erroneous as a matter of law.

Pew, of course, agreed to delay operations from August 31, 2007, through September 15, 2007, as a condition of receiving the award and as a supplemental contract term. Plaintiff, however, asserts that Mr. Pew signed the waiver agreement under duress. Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts. *See North Star Steel Co. v. United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007). Plaintiff claims that it had no choice but to sign the waiver due to its financial situation. However, it has failed to present any evidence that would suggest that this hardship was caused by defendant or that defendant committed any wrongful acts that would amount to coercion. *See Peters v. United States*, 694 F.2d 687, 694 (Fed. Cir. 1982); *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1042 (Ct. Cl. 1976); *LaCrossee Garment Mfgr. Co. v. United States*, 432 F.2d 1377, 1382 (Ct. Cl. 1976). Therefore, Pew's claim of duress fails and the release that it signed is valid and enforceable.[7] As such, the "delay" in logging operations that occurred from August 31, 2007, through September 15, 2007, cannot constitute a breach of the timber contracts, as it was fully authorized by plaintiff. *See Irwin v. United States*, 104 Ct. Cl. 84, 110 (1945) ("no breach" where actions "were authorized by the contract.").

The court also rejects plaintiff's claim that defendant breached the timber contracts by delaying logging operations to permit the pike eradication project to proceed. Pew, of course, received notice from the Forest Service, prior to bidding on the sales, warning it that a pike eradication project was planned by the California Department of Fish and Game and that the project could affect access to the timber sales area between July and October, 2007. That is what happened – although the extent of the delay occasioned with that project is less than clear. What is eminently clear is that there is not a shred of evidence that the Forest Service ever instructed Pew to cease operations until the eradication program was completed.[8] One must assume, then,

---

[7] Having explicitly agreed to this provision, plaintiff cannot, at the same time, contend that it violated the implied covenants of good faith and fair dealing. A breach of that duty can only be established by a showing that defendant "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *see also Centex Corp.*, 395 F.3d at 1304; *Jay Cashman, Inc. v. United States*, 88 Fed. Cl. 297, 308 (2009).

[8] Plaintiff asserts that on September 17, 2007, the Forest Service "again required the Pews to stop logging operations for the Lake Davis Pike Eradication." In support of this claim, it cites to Jared Pew's deposition testimony. The cited pages of the transcript, however, do not remotely support plaintiff's claim. Accordingly, plaintiff has neither borne its burden of establishing this fact nor even that of showing that a genuine issue of material fact exists thereon. *See* RCFC 56(c)(1)(A); 56(e) ("If a party fails to properly support an assertion of fact . . . the court may grant summary judgment . . . "); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) ("If the evidence [on which a party relies] is merely colorable . . . or is not significantly probative summary judgment may be granted.").

that if plaintiff ceased operations because of the eradication program, it did so at the behest or instruction of the State of California. Defendant cannot be held liable for that conduct – and the resulting unavailability of the site – unless government representatives are found to be at fault or there is an express representation in the contracts that can be interpreted to insure an unqualified warranty of accessibility. *See United States v. Howard P. Foley Co., Inc.*, 329 U.S. 64, 66-67 (1946); *Gilbane Bldg. Co. v. United States*, 333 F. 2d 867, 869 (Ct. Cl. 1964); *Ryco Const., Inc. v. United States*, 55 Fed. Cl. 184, 191-92 (2002). Neither has been shown here. Indeed, in terms of accessibility, plaintiff was told quite to the contrary at least insofar as the pike eradication project is concerned.

### III. CONCLUSION

Finding the remainder of plaintiff's arguments likewise untenable,[9] the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for partial summary judgment. The Clerk is hereby ordered to dismiss plaintiff's complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[9] The court, for example, has considered and rejects plaintiff's assertion that defendant failed to provide it relief under contract provisions B8.33 and B3.33. A simple review of those provisions makes clear that they did not deal with short-term delays of the sort alleged by plaintiff. *See Scott Timber Co. v. United States*, 333 F.3d 1358, 1366-67 (Fed. Cir. 2003) (giving effect to clause in timber contract that "expresses a clear purpose in clear language").